## YOUNG v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit. March 5, 1928.

No. 5323.

Conspiracy ⬤⟳48—Evidence of conspiracy to violate National Prohibition Act held for jury (27 USCA).

Evidence considered, and held sufficient to submit to jury in prosecution for conspiracy to violate the National Prohibition Act (27 USCA).

In Error to the District Court of the United States for the District of Oregon; John H. McNary, Judge.

Criminal prosecution by the United States against Robert L. Young and others. Judgment of conviction, and defendant Young brings error. Affirmed.

Martin L. Pipes and John M. Pipes, both of Portland, Or., for plaintiff in error.

George Neuner, U. S. Atty., and Millar E. McGilchrist, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. By the indictment, Robert L. Young and nine others were charged with a conspiracy to violate the National Prohibition Act (27 USCA). Some of the defendants pleaded guilty, and upon trial the others were convicted. Young alone brings error and his one contention is the insufficiency of the evidence to connect him with the conspiracy, the existence of which is not questioned.

As alleged, the conspiracy was formed on or about September 1, 1926, and continued up to April 4, 1927, on which latter date a raid was made on what is referred to as the Abernathy Place, a few miles from Portland, Or., resulting in the seizure of a 400-gallon still, 4,000 gallons of mash, 23 gallons of whisky together with other properties, and the immediate arrest of some of the defendants. Young had, for about fifteen months prior thereto, been employed as the manager of one of the stores of the Pacific Supply Company, a wholesale and retail house in Portland, handling barrels, kegs, jugs, sugar, malt, syrups, pressure tanks, and other supplies more or less commonly used in the illicit liquor business. He was well acquainted with his codefendant, Roy Solem, who was the manager of a yeast company, having its place of business about a block from the store run by him, and the two were seen together not infrequently at the store and other places. He was also acquainted with two other defendants, Mark Daniel and Gus Daklos. He was the apparent owner and had control of a certain Cadillac car which he housed at the Model Garage, where Daniel was employed. The car was used by him from time to time in delivering goods from his store to various places in the city. On April 2d, two days before the raid, three of the defendants, Gus Daklos, Tom Daklos, and William Bennett were seen using the car in delivering supplies to the still, but there was no direct evidence that such use was with Young's knowledge or consent. Young also had control of other cars, one being an Oldsmobile, which he used in the delivery of goods. While hauling 45

24 F.(2d)—41

gallons of moonshine whisky in this car on December 31, 1926, he was arrested, and for the offense thus committed he was subsequently convicted in the federal court.

Mark Daniel, a youth 20 years old, was in the employ of his brother-in-law, R. W. Miller, who was the owner of the Model Garage and was understood by members of the conspiracy to be opposed to the illicit liquor business. Miller knew Young and Solem pretty well, but apparently was not acquainted with the other defendants, excepting Daniel. Daniel was acquainted with Young and Solem and some of the other members of the conspiracy, and apparently without Miller's knowledge, was drawn into the enterprise by Solem, who engaged him to haul supplies left at the garage by Young's company, to the still, and bring back to Portland moonshine whisky, for which service he was paid at the rate of $5 a trip. On one occasion during the period of the conspiracy, Young, first satisfying himself that Miller was not about the premises, left at the garage a Chandler car, in which there were 15 sacks of sugar which Solem had directed Daniel to take to the still. Upon inquiring of Daniel whether he was going to drive the car and receiving an affirmative answer, Young suggested that if he (Daniel) was stopped by the officers, he should say to them that the sugar was to be used for baking purposes. This Chandler car was at the time either owned or under the control of Solem and another of the defendants. Daniel did, in fact, drive the car out to the still, where he delivered the sugar, and then took on 45 gallons of whisky, which he brought to Portland. On the day of the raid this car was seized on the Abernathy place near the still, at which time it was loaded with 90 gallons of whisky. Upon another occasion, calling Daniel over the telephone, Solem first inquired whether Miller was present, and then asked him to go to Young's store for a car loaded with supplies. Daniel was busy at the time, and a little later a young man working for or under Young drove the car of supplies past the Model Garage about a block, waving at Daniel as he passed, and left it across the street from Solem's place, where Daniel later took charge of it. With added details, as set forth in the record, these circumstances are perhaps more persuasive than as they appear in this brief sketch, and there are other circumstances which, though remote, are not without some probative force. And two incidents follow-

ing the raid make direct and material contributions.

On the day after the raid, Miller, who had indirectly heard that his young brother-in-law, Daniel, had been arrested, sought information from Young. Observing him enter a restaurant, he went in and took a seat at the same table with him. In some connection the Cadillac car was mentioned in the course of an ensuing conversation. "I asked him," testified Miller, "where Mark (Daniel) was, and so forth, and he didn't know, or at least said he didn't; and he said he was afraid that they had been using the Cadillac to- haul booze in. He said he had given them instructions that they were not to haul anything but supplies in the car, and that, since the car had not come back yet, he was afraid they had picked it up with a load in it."

The other incident took place at Solem's house. Daniel was called there by Solem shortly after the raid, and was interrogated as to what he had said to the officers at the time of his arrest. In a few minutes Solem called some one over the telephone, and a little later, so Daniel testified, "Young came bouncing in the door." He was excited and angry, and, according to Daniel's testimony, he "started in cussing, picked up a chair like he was going to bust it on somebody and decided to change his mind. He says * * * I was a hell of a guy. * * * He wanted to know what I had against him." It is to be inferred from this and other things occurring there that Young believed and charged that Daniel had given information to the officers implicating him. Upon a denial by Daniel of this charge, Young closed the stormy interview with this significant declaration: "Well, * * * it came from the garage, some place over there, because that is the only place they know anything about it."

Considered altogether, we think the circumstances in evidence were sufficient to require submission to the jury, and accordingly the judgment is affirmed.